**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**CASE NO. 0:21-md-03015-SINGHAL**

IN RE:                                                    MDL CASE NO.: 3015

**JOHNSON & JOHNSON SUNSCREEN**
**MARKETING, SALES PRACTICES AND**
**PRODUCTS LIABILITY LITIGATION**
_____ /


**THIS DOCUMENT RELATES TO: ALL CASES**
_____ /


<u>**PLAINTIFFS' MOTION AND MEMORANDUM IN SUPPORT OF FINAL APPROVAL**</u>
<u>**OF CLASS ACTION SETTLEMENT**</u>

Pursuant to Federal Rule of Civil Procedure 23 and the Court's preliminary approval order (Doc. 68), Plaintiffs Katherine Brennan, Michelle Mang, Meredith Serota, Jacob Somers, Lauren Harper, Dina Casaliggi, Kelly Granda, Kyra Harrell, Carman Grisham, Heather Rudy, Fredric Salter, and Judith Barich on behalf of the putative classes (collectively, "Plaintiffs"), respectfully move for entry of a Final Order and Judgment: (1) confirming their appointment as the class representatives for the Class;[1] (2) confirming the appointment of Class Counsel; (3) confirming and making final the Court's certification of the Class for settlement purposes only; and (4) granting final approval to the Parties' Settlement and Release.

This motion is based on the following Memorandum of Points and Authorities; the accompanying declaration of attorney Kiley Grombacher; the declarations of the named plaintiffs; the declaration of Tiffany Janowicz; Plaintiffs' pending Motion and Memorandum in Support of

_____

[1] The Plaintiffs employ certain capitalized words and phrases in this memorandum that are defined in Section 2 of the Parties' Settlement, which is attached to the Declaration of Kiley Grombacher ("Grombacher Decl.") as Exhibit 1.

13769986v.2

Attorneys' Fees, Costs, and Service Award (Dkt. No. 78-1) ("Fee Motion"); the declarations of R. Jason Richards, Bryan F. Aylstock, David Byrne, Andy Birchfield, Seth Meyer, Kim Channick and Alexandria Walsh submitted in support of the Fee Motion and the exhibits attached thereto ("Class Counsel Decl."); the Court's March 28, 2022 Preliminary Approval Order (Dkt. No. 68); other pleadings on file in this matter; any other materials or testimony that may be submitted at the final hearing; and any further argument that the Court might allow. The Parties' proposed Settlement is attached as Exhibit 1 to the Declaration of Kiley Grombacher ("Grombacher Decl.").

On June 23, 2022, the Court granted Plaintiffs leave to file a memorandum exceeding Local Rule 7.1(c)(2)'s twenty (20) page briefing limitation. (Dkt. No. 81).

Prior to the filing of this motion, the undersigned conferred with counsel for Johnson & Johnson Consumer Inc. (hereafter "JJCI") pursuant to Local Rule 7.1(a)(3) regarding this motion and the relief it seeks, and JJCI's counsel stated their non-opposition to this motion for purposes of settlement only. Plaintiffs request oral argument on this motion, should the Court desire it, pursuant to Local Rule 7.1(b)(1). It is estimated that oral argument will require no more than one hour.

# Table of Contents

I.      INTRODUCTION..................................................................................................................8

II.     BACKGROUN OF EVENTS PRECIPITATING THIS LITIGATION

III.    PROCEDURAL BACKGROUND....................................................................................11

IV.     SYNOPSIS OF THE SETTLEMENT TERMS ................................................................17

V.   THE PARTIES AND THE THIRD-PARTY ADMINISTRATOR HAVE DUTIFULLY COMPLIED

WITH THE NOTICE PROCESS APPROVED BY THE COURT................................................20

VI.     THE SETTLEMENT CLASS HAS RESPONDED FAVORABLY TO THE SETTLEMENT ........24

VII.    FINAL APPROVAL OF THE SETTLEMENT IS WARRANTED...................................25

VIII.   CONCLUSION ..................................................................................................................35

LOCAL RULE 7.1(a)(3) CERTIFICATION................................................................................35

## <u>TABLE OF AUTHORITIES</u>

Cases

2:07-CV-1928,
    2010 WL 10959223 (N.D. Ala. Apr. 27, 2010) ..................................................................28

*Allapattah Servs., Inc. v. Exxon Corp.*,
    454 F. Supp. 2d 1185 (S.D. Fla. 2006)..............................................................................20

*Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*,
    211 F.R.D. 457 (S.D. Fla. 2002) ...............................................................................25, 34

*Austin v. Penn. Dept. of Corrections*,
    876 F. Supp. 1437 (E.D. Pa. 1995) ...................................................................................34

*Begley v. Ocwen Loan Serv., LLC*,
    No. 3:16-cv-149, 2017 WL 11672899 (N.D. Fla. Nov. 22, 2017)..................................10, 32

*Behrens v. Wometco Enters., Inc.*,
    118 F.R.D. 534 (S.D. Fla. 1988) ......................................................................................31

*Bennett v. Behring Corp.*,
    737 F.2d 982 (11th Cir. 1984)......................................................................................25, 27

*Borcea v. Carnival Corp.*,
    238 F.R.D. 664 (S.D. Fla. 2006) ......................................................................................26

*Braynen, et al. v. Nationstar Mortgage, LLC, et al.*,
    No. 14-cv-20726, 2015 WL 6872519 (S.D. Fla. Nov. 9, 2015)...........................................33

*Carson v. Am. Brands, Inc.*,
    450 U.S. 79 (1981) ...........................................................................................................27

*Cotton v. Hinton*,
    559 F.2d 1326 (5th Cir. 1977)..........................................................................................26

*Domestic Air Transp. Antitrust Litig*,
    148 F.R.D. 297 (N.D. Ga. 1993).......................................................................................33

*Faught v. Am. Home Shield Corp.*,
    668 F.3d 1233 (11th Cir. 2011)..........................................................................23, 24, 28

*Figueroa v. Sharper Image Corp.*,
    517 F. Supp. 2d 1292 (S.D. Fla. 2007)..............................................................................31

*Fresco v. Auto Data Direct, Inc.*,
    No. 03-cv-61063, 2007 WL 2330895 (S.D. Fla. May 14, 2007) ...........................................27

*Hall v. Bank of Am.,* N.A.,
   No. 12-cv-22700, 2014 WL 7184039 (S.D. Fla. Dec. 17, 2014) ............................................33

*Hamilton v. SunTrust Mortg. Inc.*,
   No. 13-cv-60749, 2014 WL 5419507 (S.D. Fla. Oct. 24, 2014) ...........................................33

*In re Apple iPhone 4 Products Liab. Litig.,*
   2012 WL 3283432 (N.D. Cal. Aug. 10, 2012) .......................................................................34

*In re Art Materials Antitrust Litig.,*
   *MDL* No. 436, 100 F.R.D. 367 (N.D. Ohio 1983) .................................................................34

*In re Lorazepam & Clorazepate Antitrust Litig.,*
   MDL No. 1290, 2003 WL 22037741 (D.D.C. June 16, 2003) ...............................................27

*In re Polyurethane Foam Antitrust Litigation*,
   2015 WL 1639269 (N.D. Ohio Feb. 26, 2015) ......................................................................32

*In re Rite Aid Corp. Sec. Litig*.,
   146 F. Supp. 2d 706 (E.D. Pa. 2001) ....................................................................................32

*In re Smith*,
   926 F.2d 1027 (11th Cir. 1991).............................................................................................26

*Ingram v. The Coca-Cola Co*.,
   200 F.R.D. 685 (N.D. Ga. 2001)...........................................................................................29

*Jairam v. Colourpop Cosmetics, LLC,*
   No. 19-cv-62438, 2020 WL 5848620 (S.D. Fla. Oct. 1, 2020).................................... passim

*Johnson v. NPAS Sols., LLC,*
   975 F.3d 1244 (11th Cir. 2020).............................................................................................20

*Juris v. Inamed Corp.,*
   685 F.3d 1294 (11th Cir. 2012).............................................................................................23

*Lee v. Ocwen Loan Serv., LLC,*
   2015 WL 5449813 (S.D. Fla. Sept. 14, 2015).......................................................................29

*Leverso v. Southtrust Bank*,
   18 F.3d 1527 (11th Cir. 1994)...............................................................................................27

*Lipuma v. American Express Co.*,
   406 F. Supp. 2d 1298 (S.D. Fla. 2005).................................................................................34

*Mangone v. First USA Bank*,
   206 F.R.D. 222 (S.D. I11. 2001)..........................................................................................34

*Minter v. Wells Fargo Bank, N.A.,*
  283 F.R.D. 268 (D. Md. 2012) ............................................................23

*Morgan v. Public Storage,*
  301 F.Supp.3d 1237 (S.D. Fla. 2016)..................................................31

*Nat'l Rural Telecomm. Coop.,*
  221 F.R.D. ...........................................................................................32

*Officers for Justice v. Civil Serv. Comm'n,*
  688 F.2d 615 (9th Cir. 1982) ..............................................................26

*Perez v. Asurion Corp.,*
  501 F. Supp. 2d 1360 (S.D. Fla. 2007)...............................................28

*Perks v. Activehours, Inc.,*
  2021 WL 1146038 (N.D. Cal. Mar. 25, 2021) ..............................24, 25

*Pinto v. Princess Cruise Lines,*
  513 F. Supp. 2d 1334 (S.D. Fla. 2007)...............................................32

*Poertner v. The Gillette Company,*
  618 F.App'x 618 (11th Cir. 2015).......................................................34

*Poertner v. The Gillette Company,*
  *et al.,* 2014 WL 4162771 (fn. 9 (M.D. Fla. Aug. 21, 2014)................34

*Poertner v.Gillette Co.,*
  618 F. App'x 624 (11th Cir. 2015).......................................................28

*Rankin v. Rots,*
  2006 WL 1876538 (E.D. Mich. June 27, 2006) .................................26

*Reynolds v. Beneficial Nat. Bank,*
  288 F.3d 277 (7th Cir. 2002)...............................................................29

*Saccoccio v. JP Morgan Chase Bank, N.A.,*
  No. 13-21107-CIV, 2014 WL 3738013 (S.D. Fla. July 28, 2014)........34

*Sawyer v. Intermex Wire Transfer, LLC,*
  No. 19-cv-22212, 2020 WL 5259094 (S.D. Fla. Sept. 3, 2020) ...........20

*Shames v. Hertz Corp.,*
  No. 07-2174-CIV, 2012 WL 5392159 (S.D. Cal. Nov. 5, 2012)..........34

*Torres v. Bank of Am. (In re Checking Account),*
  830 F. Supp. 2d 1330 (S.D. Fla. 2011)...........................................26, 30

*U.S. v. Alabama,*
   271 F. App'x .................................................................................................23, 26

*Warren v. Tampa,*
   693 F. Supp. 1051 (M.D. Fla. 1988) ..............................................................33

Statutes

28 U.S.C. § 1407.......................................................................................................13

Rules

FED. R. CIV. P. 23(e)(1) .....................................................................................23, 27

FED R. CIV. P. 23(c)(2)(B) ......................................................................................23

FED R. CIV. P. 23(e) ...........................................................................................25, 27

Federal Rule of Civil Procedure 23 .............................................................2, 23, 35

Other Authorities

JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND
   PRACTICE § 6:17 at 129-30 (10th ed. 2013)......................................................23

JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND
   PRACTICE § 6:28 at 197 (10th ed. 2013) ...........................................................20

Newberg on Class Actions § 11.41 (4th ed. 2002) ...................................................26

MANUAL FOR COMPLEX LITIGATION (THIRD) § 30.42 (1995)....................................27

## MEMORANDUM OF POINTS AND AUTHORITIES

The Court granted preliminary approval of the Parties' Settlement on March 28, 2022 (Dkt. No. 68), and Plaintiffs now request that this Court grant final approval of the Settlement. For the Court's reference, the agreement is attached as Exhibit 1 to the Declaration of Kiley Grombacher ("Grombacher Decl.").

## I.    INTRODUCTION

Plaintiffs brought this lawsuit on behalf of themselves and a putative class of consumers seeking monetary and injunctive relief for themselves and others who purchased Neutrogena® brand Aerosol Products allegedly contaminated and/or adulterated with benzene, a known human carcinogen. *See generally Serota v. Johnson & Johnson Consumer Inc.*, No. 21-cv-61103 (S.D. Fla.), ECF No. 4, Amend. Compl. The Settlement before this Court, which conservatively values more than Eighty Million Dollars ($80,000,000.00), accomplishes both aims. First, the Settlement provides the Class a full accounting by (1) ensuring the availability of a full refund for aerosol sunscreen products subject to JJCI's voluntary recall (hereafter "Aerosol Products")[2] through January 14, 2022 and (2) providing a voucher equal to the average retail selling price of certain Non-Aerosol Products[3] which may be used toward the purchase of any Neutrogena or Aveeno product(s).

Second, the Settlement offers significant injunctive relief requiring JJCI to direct its external manufacturer to (1) purge any existing inventory of isobutane intended for the use in

---

[2] The aerosol Aerosol Products impacted by the recall were: (1) NEUTROGENA® Beach Defense® aerosol sunscreen; (2) NEUTROGENA® Cool Dry Sport aerosol sunscreen; (3) NEUTROGENA® Invisible Daily™ defense aerosol sunscreen; (4) NEUTROGENA® Ultra Sheer® aerosol sunscreen, and (5) AVEENO® Protect + Refresh aerosol sunscreen.

[3] The three (3) Non-Aerosol Products encompassed within the Settlement are: Neutrogena® Ultra Sheer® Dry-Touch Water Resistant Sunscreen, Neutrogena® Sheer Zinc™ Dry-Touch Face Sunscreen, and Aveeno® Baby Continuous Protection® Sensitive Skin Sunscreen Lotion.

Aerosol Products; (2) adopt new testing protocols requiring any supplier of isobutane raw material intended for use in Aerosol Products to test for the presence of benzene at no more than 1 part per million ("PPM") and refrain from shipping such raw material unless the shipment has passed such test; and (3) engage an independent, ISO-certified laboratory to test random samples from at least 25% of manufacturing lots of finished goods Aerosol Products for the presence of benzene, and to withhold release of such finished goods from such lots unless all samples have passed the test. Class Counsel has verified that all such protocols have been implemented and complied with.

While the claims period has not yet expired (but will by the time of the final approval hearing), the response of Class Members to the settlement thus far has been almost universally supportive. There have been no objections and only two (2) requests for exclusions have been received. (Declaration of Jason Rabe ("Rabe Decl.") at ¶¶ 14, 15.) At the same time, the Settlement Administrator has already received more than 172,611 claims resulting in a claims rate on par with, if not exceeding, that achieved in consumer class action settlements previously approved in this Circuit. The overwhelmingly positive response to the Settlement (in terms of the high participation, low opt-out and non-existent class member objection rates) is not surprising. As detailed below, the Settlement provides significant relief for the Settlement Class and fulfills the dual purposes of the consumer protection laws: providing equitable relief in the form of manufacturing changes on a go-forward basis, as well as providing monetary relief to the Settlement Class through cash payments and vouchers. The favorable reaction of the Class is, in other words, likely due to the extraordinary result achieved here, as it is "a rare class action settlement which provides complete relief for all alleged harms," *Begley v. Ocwen Loan Serv., LLC*, No. 3:16-cv-149, 2017 WL 11672899, at *4 (N.D. Fla. Nov. 22, 2017), and does so for a

"cost" of less than half of what normally is awarded (in terms of attorneys' fees, costs and representative awards, though all these costs are being paid separately here) in similar litigation.[4] In all respects the Settlement is fair, adequate and reasonable, and readily meets the standard for final approval.

## II.        BACKGROUND OF EVENTS PRECIPITATING THIS LITIGATION

On May 25, 2021, Valisure, an independent third-party laboratory, filed a Citizen Petition with the U.S. Food and Drug Administration ("FDA") wherein Valisure reported it had tested numerous lots of aerosol and lotion Aerosol Products from various manufacturers and discovered that many of them, including certain JJCI aerosol sunscreens, contained benzene.[5] JJCI, which had previously been unaware of the presence of benzene as a contaminant in its sunscreen production, immediately began a comprehensive investigation. The investigation confirmed the presence of benzene in some of its aerosol Aerosol Products and determined that the isobutane used as a propellant in those aerosol product lines was the root- cause of such contamination.

Thereafter, on July 14, 2021, JJCI instituted a nationwide voluntary recall from all distribution channels of five product lines of aerosol Aerosol Products that had been found to contain benzene, and instructed consumers in possession of such Aerosol Products to stop using the products. JJCI's lotions, sticks, face mist sunscreens, and sunless tanning products were not impacted by the voluntary recall. On the same day JJCI instituted its recall, it announced it would offer full cash refunds for the affected products, and established a process for claimants to obtain such refunds. That refund program, which is discussed in detail below, has since

---

[4] While Plaintiffs' Fee Motion had estimated that the percentage sought would be less than 30%, it is now clear that the percentage is approximately a mere 3% of the fund's value.
[5] Neither JJCI's testing nor the testing conducted by Element (formerly Avomeen), an independent testing laboratory retained by Class Counsel, detected the presence of benzene in samples of non-aerosol products.

concluded.

Over the course of this litigation, JJCI has fully cooperated with the Plaintiffs in their effort to identify and investigate the benzene contamination issue; in identifying the number of lots potentially affected by contamination issue; and in developing a plan to remediate any potential benzene contamination in the Aerosol Products in the future. (Grombacher Decl. ¶ 9.)

## III.   PROCEDURAL BACKGROUND

### A.   Overview of the Filings & Claims of the Litigation

Plaintiff Serota initially commenced her action in this Court on May 25, 2021. *See generally* Compl., ECF No. 1. Serota's case is the first filed of all cases seeking class relief arising out of the presence of benzene in JJCI's Aerosol Products. Plaintiffs' operative complaint—the First Amended Class Action Complaint, ECF No. 4—asserts claims on behalf of the named plaintiffs and a putative class of consumers for violations of various states' consumer protection and/or deceptive and unfair trade practices acts, unjust enrichment, negligent misrepresentation/omission, breach of express and implied warranties, strict product liability-failure to warn, and strict product liability-manufacturing defect. *See generally Serota v. Johnson & Johnson Consumer Inc.*, No. 21-cv-61103 (S.D. Fla.), ECF No. 4, First Am. Compl. ¶¶ 38-237. The relief sought under all of these claims is compensatory and injunctive in nature. Plaintiffs seek, *inter alia*, an award of compensatory damages, interest, and attorneys' fees and costs, as well as injunctive relief to prevent JJCI from continuing to market and sell Aerosol Products that may be contaminated with benzene. *Id.* at ¶¶ 1, 36, 52.

On May 26, 2021, Katherine Brennan and Michelle Mang, California residents, filed a lawsuit in the Superior Court for the State of California, County of Ventura, which was subsequently removed by JJCI to the United States District Court for the Northern District of

California, seeking to represent a putative California-only class. *See Brennan v. Johnson & Johnson Consumer Inc.*, 21-cv-5419 (N.D. Cal.) (the "*Brennan* Action"), ECF No. 1. The *Brennan* Plaintiffs alleged that certain JJCI Aerosol Products sold in California were contaminated with benzene and sought injunctive relief and compensation for alleged economic losses sustained by California consumers. The *Brennan* action was the second-filed class action.

Following the *Serota* and *Brennan* filings, fourteen additional litigations were filed throughout the country. On July 29, 2021, Plaintiffs in one such action, *Jimenez v. JJCI* ("*Jimenez* Action"), filed a motion for consolidation before the Joint Panel on Multidistrict Litigation ("JPML"), advocating for consolidation in the District of New Jersey. *See* ECF Doc. 5 (Motion of *Jimenez* Plaintiffs for Transfer of Actions to the District of New Jersey Pursuant to 28 U.S.C. § 1407 for Coordinated or Consolidated Pretrial Proceedings). Ultimately, the JPML consolidated the cases before this Court. ECF No. 1, at 2.

On February 9, 2022, this Court appointed Aylstock, Witkin, Kreis & Overholtz, PLLC; Bradley/Grombacher, LLP; Beasley, Allen, Crow, Methvin, Portis & Miles, PC; Keller Lenkner LLC;[6] and Walsh Law, PLLC as Interim Class Counsel. (Dkt. No. 64).

### B.     Summary of Settlement Negotiations and Mediation

After filing of the *Serota* and *Brennan* complaints, Class Counsel began settlement discussions with JJCI. After a preliminary exchange of information and several rounds of bilateral discussion, the Parties agreed to jointly retain former United States District Court Judge John C. Lifland as a mediator in an attempt to reach a nationwide resolution. (Grombacher Decl. ¶ 11.) Mediation statements were prepared by both Parties and submitted prior to mediation. (Id at ¶12.)  The mediation session took place on September 8, 2021, wherein the Parties discussed

---

[6] Keller Lenkner LLC has since been renamed Keller Postman LLC.

and evaluated the claims, damages, allegations and defenses, and were able to agree in principle on a general framework for global settlement, including with respect to retailer defendant Costco Wholesale Corporation ("Costco").[7] Id.

The Parties agreed to continue negotiations after the mediation to finalize the specific settlement terms, and for several weeks thereafter Class Counsel and JJCI's counsel did so. Id at ¶13.  During this process, Class Counsel also retained experienced experts and consultants to evaluate JJCI's factual representations. Id at ¶ 14. Ultimately, the Parties were able to reach an agreement in principle to settle the litigation on a class-wide basis. Id at ¶15.  The agreement in principle was memorialized on October 21, 2021 via a confidential term sheet. Id. A notice of settlement was then filed with the Court on October 29, 2021. *See* ECF No. 25.

Before and during these settlement discussions and mediation, as described above, the Parties had an arm's-length exchange of information sufficient to permit both Parties and their counsel to evaluate the claims and potential defenses and to meaningfully conduct informed settlement discussions. Id at ¶17.

### C.      Investigation and Informal Discovery

Although information was exchanged in advance of mediation, Class Counsel specifically negotiated for additional disclosures of data, documents and information to confirm JJCI's factual representations. Following execution of the Confidential Term Sheet, the Parties began drafting the necessary documentation to allow for this disclosure of documents and information. Class Counsel initially drafted and provided JJCI with a list of documents and data they requested be provided, which was subsequently negotiated by the Parties and revised. Id at

---

[7] Costco is named as a defendant in one of the Actions pending before this Court. *See McLaughlin v. Johnson & Johnson Consumer, Inc.*, No. 21-cv-62190 (S.D. Fla.).

¶25.  Following an agreement on the initial voluntary disclosures to be provided, the Parties negotiated a non-disclosure agreement, which was executed on November 20, 2021. Id at ¶26. On November 30, 2021, JJCI began its voluntarily disclosure of data, information and sworn statements by company employees. Id at ¶27.

Over the course of the Parties' negotiations, JJCI voluntarily produced information by which Plaintiffs were able to further assess the merits of the claims and defenses, as well as confirm JJCI's factual representations. Id at ¶28. The material produced included information regarding JJCI's notice of benzene contamination, communications between JJCI and its affiliates concerning benzene contamination; information regarding studies and analysis performed by JJCI with respect to benzene contamination; JJCI's communications with FDA regarding the contamination; information about JJCI's sunscreen manufacturers and raw material suppliers; and information on JJCI's refund program, including procedures and protocols for processing refunds, criteria for payment, number of claims made, refund amounts paid, consumer complaints made, and consumer communications. Grombacher Decl. ¶ 29.

These voluntary exchanges of information were coupled with Plaintiffs' independent investigation regarding their claims and JJCI's defenses. Id at ¶30. Such investigation included the testing of products using an independent third-party laboratory, consultations with experts in the fields of chemistry, cosmetics, and toxicology, and informal surveys of Class Members regarding issues such as the sufficiency of JJCI's voluntary recall and refund program. Id at ¶¶21-23. Thereafter, JJCI and Class Counsel jointly drafted the Class Action Settlement Agreement that memorializes and governs the Settlement. Id. at ¶31.

### D.      Preliminary Approval

On December 17, 2021, the Parties executed the Class Action Settlement Agreement and, the same day, Plaintiffs filed a motion for preliminary approval of the proposed Settlement. The Court conducted a preliminary fairness hearing on February 17, 2022, and entered an order on March 28, 2022 granting preliminary approval of the proposed Settlement. The order also directed the nationwide class Notice Plan (defined below) to commence, and set the final approval hearing for August 12, 2022, at 2:00 p.m. (Dkt. No. 68).

### E.      Post-Approval Confirmatory Discovery

Following preliminary approval, Plaintiffs conducted depositions of two JJCI employees who were instrumental players in JJCI'S response to the purported benzene contamination. Id at ¶32. Carla Oliviera, Regional Leader for the North American Consumer Care Center (who headed the consumer-facing aspects of JJCI's recall and refund program), and Derek Henderson, Head of Global Franchise Quality at JJCI, were both subject to in-person depositions. Id. Mr. Henderson was responsible for JJCI's root-cause investigation and had knowledge regarding the company's testing, investigation, suppliers and FDA interactions. Id.

Additionally, in accordance with the terms of the Settlement, JJCI made an additional documentary production which included documents and data related to material specifications and testing. Id at ¶33. Finally, all documents produced by JJCI to Class Counsel in the course of the settlement negotiations/investigation as well as deposition transcripts, have been provided to all other plaintiffs' counsel who requested copies of such materials and executed the corresponding Acknowledgment and Agreement to be Bound by the Stipulated Protective Order. Id at ¶34.; Dkt. Nos. 71, 75.

### F.      JJCI's Monetary Refund Program Has Resulted in Full Refund Payments Collectively Totaling in Excess of Nine Million Dollars

Through due diligence, confirmatory depositions, and voluntary informal disclosures, the Plaintiffs have confirmed that, as a result of JJCI's cash refund program, 326,480 claimants have received refund checks in the amount of, on average, of $29.73.[8] Grombacher Decl. at ¶ 45.  In total, JJCI has paid consumers Nine Million Five Hundred Twenty-Eight Thousand Two Hundred Seven Dollars and Sixty-Two Cents ($9,528,207.62). *Id.* at ¶ 47.

### G.   JJCI Has Complied with Each Provision of the Settlement Related to Non-Monetary Relief

Through confirmatory depositions and review of data and documents produced, Plaintiffs have confirmed that JJCI:

(1) Directed its external manufacturer to purge any existing inventory of isobutane;

(2) Adopted new specifications applicable to any supplier of isobutane raw material for use in its aerosol Aerosol Products, that requires such raw material to contain not more than one (1) part per million (PPM) benzene;

(3) Directed its external manufacturer to require that, prior to dispatching any shipment of isobutane raw material intended for use in aerosol Aerosol Products, the raw material supplier test for the presence of benzene at one (1) PPM or more in such raw material, and to refrain from shipping such raw material to JJCI's external manufacturer unless the shipment has passed such test;

(4) Required JJCI's external manufacturer to test for the presence of benzene at one (1) PPM or more in such raw material, and to refrain from use of such raw material unless

---

[8] JJCI calculated the refund based upon either: (1) the price actually paid by the consumer for the product if such evidence was submitted by the claimant; or (2) the manufacturer's suggested retail price ("MSRP") of the aerosol product for which a refund was claimed. This ensured that Class Members received a refund of at least the full purchase price paid for the product, if not more.

it has passed such test; and

(5) Required JJCI's external manufacturer to test at least 25% of finished goods aerosol

Aerosol Products for the presence of benzene, and to refrain from release of such

finished goods unless all such samples have passed such test.

In total, the injunctive provisions of the settlement caused an estimated financial impact

to JJCI of more than Eighty Million Dollars. Grombacher Decl. at ¶48.

## IV.    SYNOPSIS OF THE SETTLEMENT TERMS

The Settlement resolves all claims of the Plaintiffs and the Class against JJCI related to

the presence of benzene in the Aerosol Products, excluding claims for bodily injuries. The details

are contained in the Class Action Settlement Agreement. *See generally* Exhibit 1 to Grombacher

Decl. The primary terms of the Settlement are described below.

## A.    The Class

The Class is comprised of all consumers who purchased Neutrogena and/or Aveeno

sunscreen products at issue in this litigation, and is defined as:

All persons and entities in the United States who, at any time between May 26,
2015 and the Notice Date purchased one or more of the Aerosol Products or Non-
Aerosol Products defined herein for personal, family, or household use and not
for resale:

Neutrogena/Aveeno Aerosol Products: Neutrogena® Beach Defense® aerosol
sunscreen, Neutrogena® Cool Dry Sport aerosol sunscreen, Neutrogena®
Invisible Daily™ defense aerosol sunscreen, Neutrogena® Ultra Sheer® aerosol
sunscreen, and Aveeno® Protect + Refresh aerosol sunscreen.

Neutrogena/Aveeno Non-Aerosol Products: Neutrogena® Ultra Sheer® Dry-
Touch Water Resistant Sunscreen, Neutrogena® Sheer Zinc™ Dry-Touch Face
Sunscreen, and Aveeno® Baby Continuous Protection® Sensitive Skin Sunscreen

Lotion.[9]

Settlement ¶ 11. Excluded from the Class are (a) all persons who are employees, directors, officers, and agents of JJCI, or its subsidiaries and affiliated companies; (b) persons or entities who purchased the Products primarily for the purposes of resale to consumers or other resellers; (c) governmental entities; (d) persons or entities who timely and properly exclude themselves from the Class as provided in this Settlement; and (e) the Court, the Court's immediate family, and Court staff. *Id.*

## B.    Right to Opt-Out of Participation

The Settlement allows any Class Member to opt-out of the Settlement and the Class. Any Class Member who wishes to seek exclusion from the Class has been advised of his or her right to be excluded, and of the deadline and procedures for exercising that right. Settlement ¶¶ 56, 76, 106.

## C.    Release

In exchange for the relief described above, and upon entry of a Final Order and Judgment approving the Settlement, the Plaintiffs and the Class will release JJCI, Costco and their related and affiliated entities (the "Released Parties," as further defined in Paragraph 34 of the Settlement) from, *inter alia*, all claims (excluding claims for bodily injuries) for injunctive relief or economic loss arising out of or relating to the facts, activities, or circumstances alleged in the Action (as defined in Paragraph 1 of the Settlement). Settlement ¶¶ 68-71. In other words, the Settlement contemplates a release specific to the subject matter addressed in this action, and does

---

[9] The Neutrogena and Aveeno products referenced in this class definition encompass the entire product lines of sunscreen products impacted by this Settlement.

not contemplate a general release of any and all claims of any kind against JJCI.

## D.    Incentive Awards to Named Plaintiffs

Under the Settlement, Class Counsel have reserved the right to seek reasonable Incentive Awards to named Plaintiffs Katherine Brennan, Michelle Mang, Meredith Serota, Jacob Somers, Lauren Harper, Dina Casaliggi, Kelly Granda, Kyra Harrell, Carman Grisham, Heather Rudy, Fredric Salter, and Judith Barich in the amount of $250 each, for a total of $3,000, for their services as the representatives of the Class. Settlement ¶ 59. The Incentive Awards would be paid separately by JJCI from the relief being offered to the Class Members, and would be in addition to any relief the Plaintiffs may receive in the refund and/or voucher programs. *Id.* at ¶ 61.

The Incentive Awards are intended to recognize the time and effort expended by the Plaintiffs on behalf of the Class in assisting Class Counsel with the prosecution of this case and negotiating the relief the Settlement proposes to confer to the Class Members, as well as the exposure and risk the Plaintiffs incurred by participating and taking a leadership role in this litigation. *Id.* at ¶ 59; *see also Sawyer v. Intermex Wire Transfer, LLC,* No. 19-cv-22212, 2020 WL 5259094, at *2 (S.D. Fla. Sept. 3, 2020) (noting "there is ample precedent for awarding incentive compensation to class representatives at the conclusion of a successful class action.") (quoting *Allapattah Servs., Inc. v. Exxon Corp.*, 454 F. Supp. 2d 1185, 1218 (S.D. Fla. 2006)). *Accord* 2 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 6:28 at 197 (10th ed. 2013) ("[T]here is near-universal recognition that it is appropriate for the court to approve an incentive award payable from the class recovery, usually within the range of $1,000 - $20,000."). Plaintiffs are cognizant of the Eleventh Circuit's opinion in *Johnson v. NPAS Sols., LLC,* 975 F.3d 1244 (11th Cir. 2020) and, while Plaintiffs are hopeful

that the petition for rehearing *en banc* will be granted,[10] the Settlement is not conditioned upon any Incentive Award being approved by the Court. Settlement ¶ 59.

**E.      Attorneys' Fees and Expenses**

Under the Settlement, Class Counsel have also reserved the right to petition the Court for an award of reasonable attorneys' fees of up to $2,500,000 and reimbursement of costs and expenses incurred in the prosecution of this case up to $100,000. Settlement at ¶ 63. The Attorneys' Fees and Expenses provision was separately and independently negotiated by the Parties apart from the class settlement provisions, in an arm's-length negotiation. Any such Attorneys' Fees and Expenses award would be paid separately by JJCI from the relief being offered to the Class Members. The Settlement is not conditioned upon any Attorneys' Fees and Expenses award being approved by the Court. *Id.*

**V.      THE PARTIES AND THE THIRD-PARTY ADMINISTRATOR HAVE DUTIFULLY COMPLIED WITH THE NOTICE PROCESS APPROVED BY THE COURT**

The Court-approved Notice Plan[11] was designed to reach the greatest practicable number of Class Members; provide Class Members opportunities to learn about the Settlement and act upon their rights; and ensure that they will be exposed to, see, review, and understand the notices. To achieve this goal, a notification program was designed and implemented that included print, digital, and social media advertising and a national press release. The Notice Plan also included notices designed to meet due process requirements.

---

[10] Based on Class Counsel's research, as of this filing the petition for rehearing *en banc* in *Johnson* remains pending.

[11] As noted by the Court: "The Court approves, as to form, content, and distribution, the Notice Plan set forth in the Settlement . . . and finds that such Notice is the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure." (Dkt. No. 68 at 5).

### A.    Paid Media Notice

A paid media program was implemented using print, digital, and social media. The publication notice provided important information regarding the subject of the litigation, the Class definition, and the legal rights available to Class Members, and directed readers to the Settlement Website to find more information. The publication notice appeared as a half-page ad in *People.*

In addition, the Notice Plan included digital advertising to provide potential Class Members with additional notice opportunities beyond the print placement. Digital advertisements were designed to alert potential Class Members to the Settlement. The simple message enabled potential Class Members to quickly determine if they might be affected by the Settlement. When visitors clicked on the advertisement, they were sent directly to the Settlement Website.

Digital advertisements (i.e. banner and social media ads) appeared between April 8, 2022, and May 19, 2022 on the following networks: Google Display Network, Facebook, Instagram, and Conversant. The advertisements ran across the networks and delivered 36,637,972 total gross impressions.[12] Targeted digital advertising appeared on Conversant to reach potential Class Members who previously purchased Aveeno or Neutrogena sunscreen.

### B.    Earned Media

The Notice Plan included a press release to supplement the paid media program. The press release was distributed on PR Newswire's US1 national wire on April 8, 2022. The release generated 360 postings of the full text of the release and received 4,801 views, 670 click-

---

[12] The phrase "gross impressions" are the total number of times a digital ad appeared online. This figure does not represent the total number of unique viewers of the ad, as some viewers will see the ad on more than one website.

throughs, and two shares. A total of 48 journalists viewed the press release. Information about the Settlement appeared in media outlets, such as MarketWatch, Markets Insider, and Benzinga. The press release included a message that highlighted the Settlement details, provided information for potential Class Members, and featured the toll-free telephone number and Settlement Website address.

### C.    Rust Published and Maintained a Settlement Website

On April 7, 2022, Rust Consulting ("Rust"), the Settlement Administrator selected by the Parties and approved by the Court (*see* Dkt. No. 68 at 5), established the Settlement Website at www.SunProductSettlement.com to enable Class Members to obtain and download information about the Settlement. The Settlement Website includes the Long Form Notice, the Claim Form, frequently asked questions, the Settlement, and other court documents from this action. Class members are able to download materials and the Claim Form and file a claim online. As of June 15, 2022, the website has had 398,973 unique visitors.

### D.    Rust Established A Toll-Free Number and Post Office Box

On April 7, 2022, Rust established a toll-free phone number to allow Class Members to listen to answers to frequently asked questions. As of June 15, 2022, Rust received 234 calls to the toll-free number. On March 30, 2022, Rust established a U.S. Mail Post Office Box (P.O. Box 2599, Faribault, MN 55021-9599) to allow Class Members to submit requests for exclusion, Claim Forms, and correspondence by mail with any specific requests or questions. Mail received at the Post Office Box is collected and processed daily. As of June 24, 2022, Rust has received 172,764 Claim Forms. Of the 172,764 Claim Forms received, 153 were received by mail and 172,611 were submitted online through the website. The Claim Form deadline is July 7, 2022.

### E.    The Notice Effectively Reached the Class Members

Before granting final approval, a court must ensure that reasonable and adequate notice was provided to class members. This is because Due Process and Rule 23 require a court to "direct notice . . . to all class members who would be bound by the" settlement. FED. R. CIV. P. 23(e)(1). Such notice must be "the best notice that is practicable under the circumstances," directed individually "to all members who can be identified through reasonable effort." FED R. CIV. P. 23(c)(2)(B).

The "best notice practicable" requirement of Rule 23 does not require that every class member actually receive notice. *Juris v. Inamed Corp.,* 685 F.3d 1294, 1321 (11th Cir. 2012). Instead, a notice program is reasonable and adequate if it is the best notice practicable, and affords notice to the substantial majority of the putative class members. *Minter v. Wells Fargo Bank, N.A.*, 283 F.R.D. 268, 276 (D. Md. 2012) (Rule 23's notice requirements satisfied where individual notice reaches "the vast majority of potential class members"); *accord* 2 JOSEPH M. MCLAUGHLIN, MCLAUGHLIN ON CLASS ACTIONS: LAW AND PRACTICE § 6:17 at 129-30 (10th ed. 2013).  Further, in determining the sufficiency of class notice, courts "look solely to the language of the notices and the manner of their distribution," *U.S. v. Alabama*, 271 F. App'x at 901, and the notice "need not include every material fact or be overly detailed," *Faught v. Am. Home Shield Corp.*, 668 F.3d 1233, 1239 (11th Cir. 2011).

Here, this Court approved the Notice Plan set forth in the Settlement, which called for notice mailed directly to Class members, publication notice, and internet notice ("Notice Plan"). The Court-approved Notice Plan also specified the content of the notices, which use simple, plain language to encourage readership and comprehension. (Rabe Decl. Exs. B-E.) In approving the Notice Plan, this Court expressly found that it "is the best notice practicable under the circumstances, and that the Notice complies fully with the requirements of the Federal Rules of Civil Procedure … and meets the requirements of Due Process." (Dkt. 68 at 9.) "The Court

further f[ound] that the Notice is rationally and sensibly calculated to, under all circumstances, reasonably apprise members of the Class of the pendency of this Action, the terms of the Settlement, and the right to object to the Settlement and to exclude themselves from the Class." *Id.* This Court then appointed Rust as Settlement Administrator and ordered it to effectuate the Notice Plan. *Id.*.

Moreover, the notice program reached more than a mere majority—the program achieved a reach[13] rate of 75%. Reach rates of between 70% and 95% are considered reasonable and adequate. *See* Federal Judicial Center, Judges' Class Action Notice and Claims Process Checklist and Plain Language Guide at 3 (3d ed. 2010), https://www.fjc.gov/content/judges-class-action-notice-and-claimsprocess-checklist-and-plain-language-guide-0) ("It is reasonable to reach between 70–95%" on class notice) (available at https://www.fjc.gov/content/judges-class-action-notice-and-claimsprocess-checklist-and-plain-language-guide-0); *Perks v. Activehours, Inc.*, 2021 WL 1146038, at *2 (N.D. Cal. Mar. 25, 2021) (citing Federal Judicial Center for same proposition). Moreover, no Class Member has objected to the sufficiency of the Notice Plan.

## VI.   THE SETTLEMENT CLASS HAS RESPONDED FAVORABLY TO THE SETTLEMENT

Although the claims, objection and exclusion period has not yet expired, the Class has already responded favorably to the settlement preliminarily approved by this Court.[14] There have been no objections to the settlement received thus far and only two (2) Class Members have requested exclusion.  (Rabe Decl. at ¶¶14, 15.)

---

[13] The term "reach" is the estimated percentage of a target audience reached through a specific media vehicle or combination of media vehicles.

[14] The deadline for the submission of claim forms, objections and requests for exclusion is July 7, 2022. (Rabe Decl. ¶¶13-15.)

At filing, One Hundred Seventy-Two Thousand Six Hundred and Eleven (172,611) Claim Forms have been submitted.  (*Id*. at ¶13.) Plaintiffs' expert has estimated that this reflects a claims rate just shy of three percent (3%).  (Grombacher Decl. ¶52.)

## VII.   FINAL APPROVAL OF THE SETTLEMENT IS WARRANTED

### A.   Standards for Final Approval

No class action may be settled without court approval. *See* FED R. CIV. P. 23(e). The decision of whether to approve or reject a settlement "is left to the sound discretion of the trial court." *Bennett v. Behring Corp*., 737 F.2d 982, 986 (11th Cir. 1984). As a matter of public policy, courts favor settlements of class actions for their earlier resolution of complex claims and issues, which promotes the efficient use of judicial and private resources. *Id*.; *see also Jairam v. Colourpop Cosmetics, LLC*, No. 19-cv-62438, 2020 WL 5848620 at *3 (S.D. Fla. Oct. 1, 2020) ("Federal courts have long recognized a strong policy and presumption in favor of class action settlements."). The policy favoring settlement is especially relevant in class actions and other complex matters, where the inherent costs, delays and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See, e.g., Ass'n for Disabled Americans, Inc. v. Amoco Oil Co*., 211 F.R.D. 457, 466 (S.D. Fla. 2002) ("There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex.") (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *see also* 4 Newberg on Class Actions § 11.41 (4th ed. 2002) (citing cases).

In evaluating a proposed class action settlement, the Court "will not substitute its business judgment for that of the parties; 'the only question . . . is whether the settlement, taken as a whole, is so unfair on its face as to preclude judicial approval.'" *Torres v. Bank of Am. (In re Checking Account)*, 830 F. Supp. 2d 1330, 1341 (S.D. Fla. 2011) (quoting *Rankin v. Rots*, 2006 WL

1876538, at *3 (E.D. Mich. June 27, 2006); *see also Jairam*, 2020 WL 5848620 at *3 (explaining that "the district court may rely upon the judgment of experienced counsel for the parties[,] . . . [and] should be hesitant to substitute its own judgment for that of counsel.").

Courts should not convert settlement fairness hearings into trials on the merits or mini-trials. *See United States v. Ala*., 271 F. App'x 896, 902 (11th Cir. 2008) ("[I]t cannot be overemphasized that neither the trial court in approving the settlement nor this Court in review that approval have the right or the duty to reach any ultimate conclusions on the issues of fact or law which underlie the merits of a dispute.") (quoting *Cotton v. Hinton*, 559 F.2d 1326, 1330 (5th Cir. 1977)); *In re Smith*, 926 F.2d 1027, 1029 (11th Cir. 1991) ("A trial judge ought not try the case during a settlement hearing and should be hesitant to substitute his or her own judgment for that of counsel."). Instead, "[t]he court's intrusion upon what is otherwise a private consensual agreement negotiated between the parties to a lawsuit must be limited to the extent necessary to reach a reasoned judgment that the agreement is not the product of fraud or overreaching by, or collusion between, the negotiating parties, and that the settlement, taken as a whole, is fair, reasonable and adequate to all concerned." *Borcea v. Carnival Corp*., 238 F.R.D. 664, 675 (S.D. Fla. 2006) (quoting *Officers for Justice v. Civil Serv. Comm'n*, 688 F.2d 615, 625 (9th Cir. 1982)). After all, the very purpose of a settlement is to avoid the need to determine sharply contested issues and to dispense with wasteful and expensive litigation and discovery. *Carson v. Am. Brands, Inc.,* 450 U.S. 79, 88 n.14 (1981) (in considering whether to approve a class settlement, courts "do not decide the merits of the case or resolve unsettled legal questions.").

Under Rule 23(e)(1), this Court should approve the class-action settlement if it is fair, reasonable and adequate, and not the product of collusion. *Fresco v. Auto Data Direct, Inc*., No.

03-cv-61063, 2007 WL 2330895, at *4 (S.D. Fla. May 14, 2007). *Leverso v. Southtrust Bank*, 18 F.3d 1527, 1530 (11th Cir. 1994); *see also Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984) (same); *Jairam*, 2020 WL 5848620 at *5 (same). A settlement is fair, reasonable, and adequate when "the interests of the class as a whole are better served if the litigation is resolved by the settlement rather than pursued." *Jairam*, 2020 WL 5848620 at *5 (quoting *In re Lorazepam & Clorazepate Antitrust Litig.,* MDL No. 1290, 2003 WL 22037741, at *2 (D.D.C. June 16, 2003) (quoting Manual for Complex Litigation (Third) § 30.42 (1995)).

The Eleventh Circuit has identified six factors to be considered in analyzing the fairness, reasonableness and adequacy of a class settlement under Rule 23(e):

(1) the existence of fraud or collusion behind the settlement;

(2) the complexity, expense, and likely duration of the litigation;

(3) the stage of the proceedings and the amount of discovery completed;

(4) the probability of the plaintiffs' success on the merits;

(5) the range of possible recovery; and

(6) the opinions of the class counsel, class representatives, and the substance and amount of opposition to the settlement.

*Leverso*, 18 F.3d at 1530 n.6; *see also Bennett*, 737 F.2d at 986. The analysis of these factors supports the clear conclusion that the Settlement is fair, adequate, and reasonable.

**B.     The Settlement Satisfies the Standards for Judicial Approval**

**1.     The Settlement is the Product of Arm's-Length Bargaining and There was No Fraud or Collusion**

There is not, nor could there be, any evidence of fraud or collusion regarding the Settlement. Indeed, the Court already found that the Settlement "is the result of arm's-length negotiations between experienced class action attorneys[.]" (Dkt. No. 68 at 2). The record

continues to support the Court's earlier finding.

The proposed Settlement resulted from intensive, arms' length negotiations between experienced attorneys over the course of an extensive mediation (with JAMS mediator, Hon. John C. Lifland (Ret.)) and post-mediation settlement conferences, both by email and telephone, that stretched over multiple weeks. Grombacher Decl. at ¶¶ 10-19. The participation of a respected neutral like Judge Lifland in the negotiation process should give the Court confidence that the negotiations were conducted in an arm's-length, non-collusive manner. *Poertner v.Gillette Co*., 618 F. App'x 624, 630 (11th Cir. 2015) (objector's claim of "self-dealing" by parties to class settlement "was belied by the record: the parties settled only after engaging in extensive arm's-length negotiations moderated by an experienced, court-appointed mediator."); *Faught v. Am. Home Shield Corp*., 2:07-CV-1928, 2010 WL 10959223, at *21 (N.D. Ala. Apr. 27, 2010) (concluding"[s]ettlement [wa]s the product of informed, arm's-length negotiations" because "the negotiations were supervised by a highly experienced mediator . . ."), *aff'd*, 68 F.3d1233 (11th Cir. 2011); *Perez v. Asurion Corp.,* 501 F. Supp. 2d 1360, 1384 (S.D. Fla. 2007) (concluding that class settlement was not collusive in part because it was overseen by "an experienced and well-respected mediator[.]").

After the mediation session, the Parties negotiated with one another to flesh out the Settlement framework, such as details of the Notice Plan. The parties continued to negotiate and exchange confidential business and technical information regarding settlement details and examined, in detail, potential approaches to injunctive relief. There is no evidence of a reverse auction[15] and attorneys' fees were not negotiated until after the substantive relief for the Class

---

[15] A "reverse auction" is "the practice whereby the defendant in a series of class actions picks the most ineffectual class lawyers to negotiate a settlement with in the hope that the district court will approve a weak settlement that will preclude other claims against the defendant." *Reynolds v. Beneficial Nat. Bank*, 288 F.3d 277, 282 (7th Cir. 2002).

had been agreed upon. *See Lee v. Ocwen Loan Serv., LLC,* 2015 WL 5449813, at *12 (S.D. Fla. Sept. 14, 2015) (finding "no collusion in the settlement negotiations and the Parties began negotiations regarding attorneys' fees only after finishing negotiating the Settlement itself."); *Ingram v. The Coca-Cola Co.*, 200 F.R.D. 685, 693 (N.D. Ga. 2001) (finding no collusion where attorneys' fees were "negotiated separately from the rest of the settlement, and only after substantial components of the class settlement had been resolved.").

Indeed, the terms of the Settlement belie collusion. Class Counsel strenuously negotiated for terms devoid of any sort of "self-dealing" or "conflict-of-interest" concerns. For example, the Settlement offers all Class Members the same form of relief—the opportunity to a monetary payment or voucher. Additionally, Class Counsel is not seeking reimbursement of more costs than were incurred in the prosecution of the action, and the fee award sought is far below those approved in similar settlements in this circuit. Accordingly, neither Plaintiffs nor their counsel are disproportionately rewarded in relation to the Settlement Class itself.

### 2. The Complexity, Expense and Likely Duration of the Litigation

If not settled, there exists real potential for years of further litigation, as well as a possibility that JJCI could prevail on the merits or defeat contested class certification. JJCI's defenses include the fact that benzene was largely undetectable in the Non-Aerosol Products and, thus, consumers in fact received the product as advertised, labeled and bargained for. Accordingly, liability was not a foregone conclusion. In addition, because different manufacturing lots of the affected products—and different products within those lots—had different characteristics and test results, Plaintiffs would have faced challenges in showing that all purchasers were adversely impacted by the alleged benzene contamination, and in meeting the ascertainability requirement of Rule 23. Moreover, JJCI could assert that benzene is not an "ingredient" in any JJCI Aerosol Products (*see* Settlement at Page 1), so there is no need to label benzene as an ingredient on Aerosol Products under applicable regulations. Another potential JJCI defense is that applicable product standards, in particular United States Pharmacopeia

("USP") <467>, arguably set a 2 PPM limit for benzene as a residual solvent in products. Thus, JJCI could argue, as other manufacturers of benzene contaminated sunscreen have done, that the presence of benzene in Aerosol Products is permitted at levels up to 2 PPM. *See*, *e.g., Bowen v. Energizer Holdings, Inc.,* Central District of California, Case No., 2:21-cv-04356-MWF-AGR, ECF Dkts. 50, 58, 62. In other words, JJCI could argue that its Aerosol Products may contain up to 2 PPM benzene, without the need to disclose the presence of benzene in its products. JJCI could also attempt to invoke standing and/or primary jurisdiction doctrines, thus potentially delaying the litigation indefinitely.

What's more, both parties retained third-party laboratories to test the Products. Therefore, if litigation had continued there would have been a "battle of experts" with an uncertain outcome. Damages would have also been highly contested based on the Parties' laboratory results. In sum, continuing this action without a settlement would have involved several major litigation risks, including, but not limited to, class certification, a motion for summary judgment, *Daubert* motions, trial, as well as appellate review following a final judgment.

### 3.   The Stage of the Proceedings and the Amount of Discovery Completed

When considering this factor, courts will look to "the degree of case development that class counsel have accomplished prior to settlement to ensure that counsel had an adequate appreciation of the merits of the case before negotiating." *In re Checking Account Overdraft Litig.*, 830 F.Supp.2d 1330, 1348 (S.D. Fla. 2011). This action was settled a few months after the first complaints were filed but only after JJCI had withdrawn the Aerosol Products from the market and provided relevant discovery which, in turn, permitted Class Counsel to evaluate the probability of success on the merits, the relevant defenses, the possible range of recovery, the likely expense and duration of the litigation and most importantly, any continuing risk to consumers. Class Counsel evaluated thousands of pages of discovery and retained and worked with experts to evaluate the merits of the claims and the relief sought. In other words, Class Counsel had a clear view of the strengths and weaknesses of the case before agreeing to and recommending approval of the Settlement. Accordingly, this factor weights in favor or approval

of the Settlement. *See Morgan v. Public Storage,* 301 F.Supp.3d 1237, 1249 (S.D. Fla. 2016); *Ressler v. Jacobson*, 822 F.Supp.1551, 1554-55 (M.D. Fla. 1992).

**4.    The Probability of the Plaintiffs' Success on the Merits and the Range of Possible Recovery in Relation to the Benefits Provided by the Settlement Support Approval**

Without a settlement, Plaintiffs and Class Members face a risk of losing on the merits of their claims at trial and receiving no relief at all. Plaintiffs' likelihood of success at trial balanced against the amount offered in the settlement is the most important factor relevant to the fairness of a class action settlement. *Figueroa v. Sharper Image Corp.*, 517 F. Supp. 2d 1292, 1323-24 (S.D. Fla. 2007). "In determining whether the Settlement is fair in comparison to the potential range of recovery, the Court is guided by 'the fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate.'" *Jairam*, 2020 WL 5848620 at *6 (quoting *Behrens v. Wometco Enters., Inc.*,118 F.R.D. 534, 542 (S.D. Fla. 1988), *aff'd*, 899 F.2d 21 (11th Cir. 1990)); *Morgan*, 301 F. Supp. 3d at 1250 (same). Indeed, "settlement can be satisfying even if it amounts to a hundredth or even a thousandth of a single percent of the potential recovery." *Behrens*, 118 F.R.D. at 542; *Morgan*, 301 F.Supp.3d at 1250. Settlement must be evaluated in light of the attendant risks of litigation, meaning the mere possibility that a class might receive more if the case were fully litigated is not a good reason for disapproving the settlement. *See Jairam*, at *6. Since the inception of this litigation, JJCI and Costco denied and continue to deny Plaintiffs' allegations and all charges of wrongdoing or liability of any kind. As detailed above, JJCI and Costco had several defenses to both liability and certification which posed a threat to recovery for Plaintiffs and Class Members.

Despite such risks, in purely quantitative terms, the relief provided is unquestionably an excellent result for the Class Members. *See, e.g., In re Polyurethane Foam Antitrust Litigation*, 2015 WL 1639269, at *5 (N.D. Ohio Feb. 26, 2015) ("A settlement figure that equates to roughly 18 percent of the best-case-scenario classwide [damages] is an impressive result in view of these possible trial outcomes."); *In re Rite Aid Corp. Sec. Litig.*, 146 F. Supp. 2d 706, 715 (E.D. Pa.

2001) (noting that since 1995, class action settlements have typically "recovered between 5.5% and 6.2% of the class members' estimated losses"); Laarni T. Bulan, Ph.D, et al., *Securities Class Action Settlements* – 2016 *Review and Analysis* 8 (Cornerstone Research 2016) (concluding that, from 2006 to 2016, the median settlement amount in securities class actions was approximately 2.5% of the class members' total estimated losses). The Settlement here offers a 100% recovery of actual damages for recalled and affected products, a recovery for seemingly non-affected products in the form of a voucher that can be used for any Neutrogena or Aveeno product (not just sunscreens), and injunctive relief, rendering it "a rare class action settlement which provides complete relief for all alleged harms." *Begley.* 2017 WL 11672899, at *4.

Although the Plaintiffs are confident that they could successfully overcome JJCI's defenses, if the Court agreed with JJCI on any of its defenses, certification could be denied or Class Members could be left with no compensation for non-recalled products, an injunctive component that is less robust than what the Settlement provides, or no relief at all. *See, e.g.*, *Nat'l Rural Telecomm. Coop.*, 221 F.R.D. at 526 (noting that in the class action settlement context, it is "proper to take the bird in hand instead of a prospective flock in the bush."); *Pinto v. Princess Cruise Lines*, 513 F. Supp. 2d 1334, 1338 (S.D. Fla. 2007) (noting that settlement was approved where "the risk of going forward was substantial" despite the court's belief that the case had merit).

This Settlement is sufficiently within the range of possible final approval to justify its preliminary approval. It provides—today, not years from now—real, substantial, and practical benefits to the Class Members. This factor, the most important of all the factors, weighs in favor of approval of the Settlement.

### 5. The Opinions of Class Counsel, Class Representatives, and the Substance and Amount of Opposition to the Settlement

Class Counsel strongly endorse the Settlement. See Declarations of Bryan Aylstock, Jason Richards, David Byrne, Seth Meyers, Alexandria Walsh, Kim Channick and Andy

Birchfield. The Court should give "great weight to the recommendations of counsel for the parties, given their considerable experience in this type of litigation." *Warren v. Tampa,* 693 F. Supp. 1051,1060 (M.D. Fla. 1988); *see also See also Jairam*, 2020 WL 5848620 at *3 (explaining that "the district court may rely upon the judgment of experienced counsel for the parties[,] . . . [and] should be hesitant to substitute its own judgment for that of counsel."); *Domestic Air Transp. Antitrust Litig*, 148 F.R.D. 297, 312-13 (N.D. Ga. 1993) (same).

Settlement Class members have likewise responded favorably to the settlement. While the objection and exclusion periods have not yet lapsed, at present, no objections have been received and only two (2) exclusions have been requested. *See* (Rabe Decl. at ¶ 15). Obviously, a low number of objections suggests that a settlement is reasonable, while a high number of objections would provide a basis for finding that a settlement was unreasonable. *Braynen, et al. v. Nationstar Mortgage, LLC, et al.,* No. 14-cv-20726, 2015 WL 6872519, at *6 (S.D. Fla. Nov. 9, 2015). The lack of opposition to the Settlement supports the conclusion that the Settlement is fair, reasonable, and adequate and deserves final approval. *Hall v. Bank of Am.,* N.A., No. 12-cv-22700, 2014 WL 7184039, at *5 (S.D. Fla. Dec. 17, 2014); *Hamilton v. SunTrust Mortg. Inc.*, No. 13-cv-60749, 2014 WL 5419507, at *4 (S.D. Fla. Oct. 24, 2014).

Moreover, the claims rate is commensurate with other consumer class actions with similar publication notice plans.[16] According to a study completed by Kurtzman Carson

---

[16] It should be noted however, that the final rate of claims is not necessary to evaluate the Settlement's fairness. A class settlement that offers significant monetary relief, "requiring only that class members submit a claim form," can be "fair and reasonable independent of the number of claims filed." *Saccoccio v. JP Morgan Chase Bank, N.A.,* No. 13-21107-CIV, 2014 WL 3738013, at *1 (S.D. Fla. July 28, 2014) ("The Court has already rejected Objectors' argument that the Court should have considered the exact number of claims filed before approving the Settlement."); see also *Shames v. Hertz Corp.*, No. 07-2174-CIV, 2012 WL 5392159, at *14 (S.D. Cal. Nov. 5, 2012) (approving settlement prior to claim deadline because even if the claim participation rate were low, it is "otherwise fair and represents a recovery of a substantial percentage of actual estimated damages" and a low rate may merely "be the result of a variety

Consultants, the median claims rate in consumer class actions is 0.023% and other courts have observed that "the expected claims rate in a consumer class action ... is less than 1%." *See Poertner v. The Gillette Company, et al.,* 2014 WL 4162771, at *5 (fn. 9 (M.D. Fla. Aug. 21, 2014) (granting final approval of settlement following a claims rate of 0.076%). Indeed, courts routinely grant approval in consumer class actions to cases with claims rates under 1%. *See, e.g., In re Apple iPhone 4 Products Liab. Litig.,* 2012 WL 3283432, at *1 (N.D. Cal. Aug. 10, 2012) (granting final approval to class settlement with a claims rate of 0.28%); *Poertner* v. *The Gillette Company,* 618 F.App'x 618 (11th Cir. 2015) (affirming approval of settlement where only 55,346 of 7.26 million class members—less than 1%—filed claims).

The near "unanimous approval of the proposed settlements by the class members is entitled to nearly dispositive weight in this court's evaluation of the proposed settlements." *In re Art Materials Antitrust Litig., MDL* No. 436, 100 F.R.D. 367, 372 (N.D. Ohio 1983); *see also Lipuma v. American Express Co.*, 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005). Here, the "small number of objectors from a plaintiff class of many thousands is strong evidence of a settlement's fairness and reasonableness." *Assn. for Disabled Americans. v. Amoco Oil Co.*, 211 F.R.D. 457, 467 (S.D. Fla. 2002); *accord Mangone v. First USA Bank*, 206 F.R.D. 222, 227 (S.D. Il1. 2001) ("In evaluating the fairness of a class action settlement, such overwhelming support by class members is strong circumstantial evidence supporting the fairness of the Settlement."); *Austin v. Penn. Dept. of Corrections,* 876 F. Supp. 1437, 1458 (E.D. Pa. 1995) ("Because class members are presumed to know what is in their best interest, the reaction of the class to the Settlement Agreement is an important factor for the court to consider.").  This factor militates in favor or approval.

---

of factors including procrastination or lack of interest," which "does not diminish the fairness of the settlement").

### C.   THE CLASS SHOULD BE FINALLY CERTIFIED

As the Court previously found in granting Plaintiffs' motion for preliminary approval, for purposes of settlement of this action, all requirements of Rule 23 are met. (Dkt. No. 68 at 4 (noting "the Class satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.")). No new or contrary evidence or information has been brought forward to undermine that sound conclusion. Accordingly, in addition to granting final approval, the Court should order certification of the Settlement Class for purposes of effectuating the Settlement.

## VIII.  CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court enter a Final Order and Judgment: (1) confirming their appointment as the Class Representatives for the Class; (2) confirming the appointment of Class Counsel; (3) confirming and making final the Court's certification of the Settlement Class for settlement purposes only; (4) granting final approval to the Parties' Settlement and Release; and (5) approving the fees and costs sought.

### LOCAL RULE 7.1(a)(3) CERTIFICATION

Counsel for Plaintiffs has conferred with Defendants' counsel and Defendants do not oppose the relief requested herein for purposes of settlement only.

Dated:  June 24, 2022

By: R. Jason Richards
**AYLSTOCK, WITKIN, KREIS &
     OVERHOLTZ, PLLC**
R. JASON RICHARDS (FL Bar # 18207)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: jrichards@awkolaw.com

By: Kiley L. Grombacher
**BRADLEY/GROMBACHER, LLP**

Kiley L. Grombacher, Esq. (245960)
Marcus J. Bradley, Esq. (174156)
Robert N. Fisher, Esq. (302919)
31365 Oak Crest Drive, Suite 240
Westlake Village, California 91361
Telephone: (805) 270-7100
Facsimile: (805) 270-7589
E-Mail:
kgrombacher@bradleygrombacher.com
mbradley@bradleygrombacher.com
rfisher@bradleygrombacher.com

*Attorneys for Plaintiff*

**CERTIFICATE OF SERVICE**

I hereby certify that on June 24, 2022, I electronically filed the foregoing with the Clerk

of the Court by using the CM/ECF system, which will send a notice of electronic filing to all

counsel of record.

By: <u>R. Jason Richards</u>
**AYLSTOCK, WITKIN, KREIS &**
**OVERHOLTZ, PLLC**
R. JASON RICHARDS (FL Bar # 18207)
17 East Main Street, Suite 200
Pensacola, FL 32502
Telephone: 850-202-1010
Facsimile: 850-916-7449
E-mail: jrichards@awkolaw.com

13769986v.2